# APPEAL OF HARMONY LODGE, I. O. O. F.

## [WILL OF EDMUND C. WISEMAN, DECEASED.]

### FROM THE DECREE OF THE ORPHANS' COURT OF PHILA-
### DELPHIA COUNTY.

Argued April 4, 1889—Decided June 28, 1889.

Where, upon the hearing of a citation to show cause why an issue devi-
savit vel non should not be ordered on the ground of mental incapacity,
the testimony submitted disclosed that the only allegation against the
mental soundness of the testator was a habit of periodical but ex-
cessive drinking; that not even ordinary intoxication at the time the
testamentary paper was executed was established; and that the instru-
ment was dictated by the testator and well understood by him at the
time and after, there was no sufficient evidence upon which a verdict
adverse to the instrument in question should be sustained, and it was
not error to refuse the issue.

Before STERRETT, GREEN, WILLIAMS, McCOLLUM and
MITCHELL, JJ.

No. 214 January Term 1889, Sup. Ct.; court below, No.
and term not given.

On February 3, 1887, the Harmony Lodge, I. O. O. F. No.
16, filed an appeal from the decree of the register of wills of
Philadelphia county, admitting to probate the will and codicil
of Edmund C. Wiseman, deceased; praying for an issue devi-
savit vel non in respect of the codicil to said will.

After argument upon the testimony submitted by depositions
taken, the court, HANNA, P. J., on July 7, 1888, filed the fol-
lowing opinion, in which the facts are sufficiently recited:

From the testimony in this matter it appears that testator, on June 8, 1885, executed his last will and testament, whereby after providing for the interment of his remains by the Harmony Lodge of Odd Fellows of this city, he bequeathed both specific and pecuniary legacies, among which the sum of $50 to Samuel Wistar, then in his employ for several years, and the sum of $500 to Harmony Lodge, in trust to invest for the benefit of inmates of the Odd Fellows' Home. To this Lodge he also bequeathed the residue of his estate absolutely. Testator further appointed the presiding officer of the lodge at the time of his decease, and Samuel Wistar, executors of his will, giving to each the sum of $50, as compensation for his services.

But for reasons satisfactory to himself, he subsequently concluded to alter the provisions of his will respecting the bequest to Harmony Lodge, and accordingly on February 4, 1886, almost eight months after the date of his will, executed a codicil, whereby he revoked the directions for the interment of his body by the lodge, and also the bequest of $50 to Samuel Wistar and the further sum of $50 to him as commissions as executor, and in lieu thereof bequeathed to him the stock, fixtures and good-will of his cigar store. He further revoked the bequest to Harmony Lodge, and the appointment of its presiding officer as one of his executors, and bequeathed the sum of $500, which by his will he had bequeathed to said lodge, to his cousin, William H. Coleman, whom he also appointed an executor, and to be in full compensation for his services as such.

This codicil was prepared by testator's attorney, to whom several days previously he had given the necessary instructions, and after it had been carefully read to him and compared with his written memoranda, was executed in the presence of his attorney and an employee in his cigar store, as subscribing witnesses. It will be observed that none of the remaining bequests contained in the will were disturbed or revoked.

Testator was unmarried and without children; his nearest of kin being his father, who still survives, and it may be well to remark, although not a legatee either by will or codicil, is not a party contestant. A few weeks after the execution of the codicil, testator, having long contemplated an ocean voyage, prevailed upon his father to accompany him. They sailed

together in March, 1886, for Europe, where they remained about two months.

For some time previous to testator's visit abroad, he had complained of failing health, superinduced beyond doubt by too frequent use of spirituous liquors. For nearly ten years he had wholly abstained, but in the summer of 1885 resumed the habit of excessive tippling. He, however, attended to his business, which had proved lucrative during his years of sobriety, although from about the time mentioned, in the main it was committed to the management of his trusted employee, Samuel Wistar. The habit which had become fixed and a species of chronic disease with testator, was deeply deplored by him, and led him to endeavor to escape its thraldom by voluntarily becoming an inmate of that excellent and benevolent institution, the Franklin Reformatory Home, where, upon seven separate occasions between July, 1885, and August, 1886, he was admitted for treatment. He remained at the home periods ranging from three days to two weeks, and strange to say, on each occasion he went to the home entirely sober, would go out and return sober, transact business while there, and the superintendent testified, "I never saw him drunk, and we never treated him as a drunken man." Testator's apparent reason for seeking the retirement, regimen and discipline of the institution was, if possible, to overcome the terrible appetite for strong drink to which he eventually succumbed. His last visit to the home was in August, 1886, which unfortunately was of but three days duration. He then returned to his own residence. The old appetite reasserted its sway, and finally, after an illness of three or four months, the disease, cirrhosis of the liver, from which he suffered, and was produced by his intemperance, culminated in his death on November 2, 1886.

The validity of the codicil is now denied by Harmony Lodge, and it is asserted it should be set aside upon two grounds, first, that at the time of its execution testator was not of sound and disposing mind and memory; and that second, its execution was produced by undue influence.

The last reason assigned we will first dispose of. And it will suffice to say that it was neither urged at the argument nor attempted to be supported by testimony.

As to the remaining reason, the alleged testamentary incapacity of testator at the date of the execution of the codicil, our conclusion is, after a careful examination of the entire testimony, that not only is the contrary satisfactorily shown, but we would not be justified in imposing upon the parties interested in this small estate the expense and delay incident to a trial by jury, where, upon the vague, meagre and indefinite testimony presented by the contestants, a verdict against the validity of the codicil should be permitted to stand.

The testamentary capacity of the testator at the date of his will is conceded by contestants ; but they allege and attempt to prove that on February 4, 1886, the date of the codicil, he was so stupefied from the use of alcoholic stimulants as to be unable to comprehend the testamentary act, and incapable of an intelligent disposition of his estate.

But from the testimony produced by the contestants, it is shown that testator, a day or two prior to the date named, sent for his lawyer, who, when he called at testator's residence, had an interview with him alone ; and, as appears from the testimony of the attorney subsequently, this was the occasion he received instructions from the testator for the preparation of the codicil, and was handed the memoranda therefor written by him.

Contestants also show that testator attended to some of the details of his business immediately prior to the execution of the codicil, although at its date he was confined to his room from illness, and gave to it personal supervision prior to the date of the codicil. That testator, prior to February 4, 1886, had been drinking intoxicating liquor immoderately is clear, from the testimony of the physician who was called to attend him on that date. He testifies that when he saw testator " he was very nervous, weak and suffering from mental and physical prostration at the time ; it was attributed to over stimulation ; there were times when he would be able to make or alter a will during the time I saw him, and there were times when he was too incoherent to do so, that is to make or alter a will." In reply to the question, " was he drunk or sober when you saw him on February 4, 1886 ? " the witness said, " it would be impossible for me to say yes or no, as I saw him then for the first time ; but he was troubled with delusions and saw figures

on the wall, and spoke of having seen them during the night and heard voices."

This witness further testified that in his opinion testator did not, at the time of his visit, possess a sound mind, memory and understanding, from the incoherency of his conversation, his nervousness and suffering from over stimulation, but such a person may afterwards be of a sound mind, memory and understanding; that testator held his hands to his head, complained of noises and confusion he had heard during the night, in his head, and "was crying at the time he was making these remarks to me;" that while in his opinion testator was not suffering from incipient mania a potu, the direct result of over stimulation as ordinarily seen in drunkenness, yet he had evidently been drinking a number of days before he saw him, and was in that condition of mania a potu produced by a withdrawal of stimulants after over stimulation; and consequently he considered it imprudent to withhold all liquor from him and directed his attendant to allow him a certain quantity at stated intervals.

So far as appears from the testimony, this witness, who is produced as the attending physician and expert, made but a single professional visit to the testator of less than one hour's duration, which happened to be upon the day the codicil was executed; and he does not venture to say that testator was intoxicated or so stupefied from the use of liquor as to be mentally incapable of a testamentary act.

But two other witnesses were produced by the contestants. One a nurse or attendant upon testator, who at his request performed such services for him from February 1st, for a period of six days, and was at testator's house in a room adjoining that occupied by him at the execution of the codicil, saw the attorney and the other attesting witness, and after their departure was informed by testator he had changed his will by giving the $500 he had intended for the old men at the home to his cousin; and this same witness admitted that testator, while he did not then inform her he had also bequeathed his store and business to Samuel Wistar, yet on a previous occasion, after the execution of his will, he stated to her that such was his intention. And during the last illness of testator he caused the will and codicil to be taken from the box in which he placed them in

safe keeping, and read to her in his presence by a friend of the witness, but who was not produced to testify. This witness, while she describes the repeated efforts of testator to obtain liquor, his frequent drinking by day and night, his manner during the single interview with the physician as related by the latter, yet does not undertake to say that at the execution of the codicil of which she was practically a witness and herself a legatee in the will, he was intoxicated, or so much under the influence of liquor that he was unconscious of the testamentary act he then performed, and incapable of intelligently disposing of his estate.

The testimony of the remaining witness for contestants has but little if any bearing upon the question, and it is extremely uncertain whether the incidents related by her occurred prior or subsequent to the execution of the codicil.

We have thus fully referred to the contestants' case to show that while Harmony Lodge is doubtless disappointed by the failure of testator to bequeath it the legacies he primarily contemplated, yet his undoubted right to dispose of his property as he deemed best must be respected and maintained, as much in his ultimate as in his prior disposition of it; and such disposition cannot be interfered with nor frustrated, except upon clear and satisfactory proof of mental incapacity at the time of revocation of his previous testamentary act, or that his power of will was under the subjection and improper influence of another, so that in reality the codicil was the will of the latter, and not of the testator.

The testimony on the part of the contestants, while it shows the testator to have been addicted to the immoderate use of intoxicating liquors, yet he was not a sot, reeling and staggering before the public gaze. He was conscious of his infirmity, which grew to be a disease, and, as he finally realized, unconquerable. He sought, by retirement to the Franklin Home, to overcome the appetite he knew would prove his ruin, but would emerge and relapse into his former habit. And at the date of execution of the codicil he was seeking recovery from the prostration produced by abstaining from proper food and the excessive use of stimulants. Yet the evidence is indisputable that at the same time he was successful in business and gave personal supervision to his store and over his employees.

And such was his concealment of his intemperance that his father, those with whom he had business dealings, and even the officials of the Franklin Home, were either in total ignorance of his habit or of its extent. That at the time of the execution of the codicil, testator, although suffering as stated, was rational and fully comprehended the nature and character of the testamentary paper, we think there can be no question, and this is shown by the testimony of the principal witness for the contestants, by his declaration to her immediately after the codicil was executed. And that testator fully comprehended his surroundings and his condition is further evident from his retiring again to the Franklin Home the second day after the date of the codicil, where he remained two weeks, and soon afterwards he with his father visited Europe as already stated.

We have not referred to the testimony on the part of the proponents, as it is unnecessary. But it may be said that while some of the witnesses recognized the intemperate habits of testator, others with whom he had business transactions were not aware of it. Both the counsel who prepared the codicil and the other subscribing witness are clear and convincing upon the entire testamentary capacity of the testator at the time of its execution; and, with the superintendent of the Franklin Home, all unite in their testimony that he was possessed of unusual business qualifications, determined will, generous impulses and benevolent disposition; so that it is not a matter of surprise, that he, unmarried and childless, should conclude to carry out his previously expressed intention of rewarding his faithful employee, and upon the eve of his departure execute the codicil bequeathing him his store, good-will, etc., and, preferring his cousin to the lodge of which he was a member, bequeathed him the legacy he had before intended for the lodge.

It is with pleasure we commend the industry and ability shown by the counsel for the contestants who has presented the case for our consideration; but, notwithstanding the earnestness evinced by her, for the reasons stated we must dismiss the appeal and refuse the issue, the costs to be paid by the contestants.

A decree refusing the issue prayed for, having been entered in accordance with this opinion, the Harmony Lodge took this appeal, assigning the decree of the court as error.

*Mrs. Carrie B. Kilgore*, for the appellant.

Counsel cited: Duffield v. Robeson, 2 Harr. (Del.) 375, 383; Redf. on Wills, part I., 161–2; Shelford on Lunacy, 274; Barrett v. Buxton, 2 Aik. 157 (16 Am. Dec. 691).

*Mr. George L. Crawford* (with whom was *Mr. George M. Dallas*), for the appellee.

OPINION, MR. JUSTICE GREEN:

A most patient and careful reading of all the testimony in this case impels us to say that there is absolutely no evidence whatever upon which it would be at all possible to sustain a verdict adverse to the will in question. We concur fully with all that is said in the opinion of the learned court below, and affirm the decree for the reasons there stated. There are really no facts in proof which show, or even tend to show, a condition of mental unsoundness at the execution of the codicil. The only opinion expressed that is worth a moment's consideration is that of Dr. Strittmatter, and he was unable to say whether the testator was drunk or sober, or had incipient symptoms of mania a potu, at the time he saw him. The testator was suffering from the effects of over-stimulation, and exhibited some, though not by any means the worst, of the symptoms of that condition. The doctor says: "He was very nervous, weak, and suffering from mental and physical prostration at the time; it was attributed to over-stimulation." He adds, "there were times when he would be able to make or alter a will during the time I saw him, and there were times when he was too incoherent to do so, that is, to make or alter a will." The whole of the testimony of this witness shows a condition of mind and body constantly seen in persons who have been taking alcohol in excess, but he does not state a single fact which exhibits in any degree a condition of mental unsoundness indicating an inability to comprehend the nature and character of the testamentary act or the particular manner of its exercise in the instance in question. So far from this being the case, the contestant's chief witness, Elizabeth Lee, testified that the testator told her immediately after the codicil was executed, that he had changed the will, and "had taken away five hundred dollars from the old men at the home and had given it to

Billy Coleman." As this was precisely what he had done, this testimony is proof conclusive that the testator was thoroughly acquainted with the contents of the codicil, and that he knew the objects and extent of his bounty both in the will and codicil, and the exact change which the latter made in the former.

The testimony of the two women, the only other witnesses for the contestants who expressed opinions, is of the most inconsequent and frivolous character, unsupported by any facts tending to show actual unsoundness of mind. If we regard the testimony of the proponents, it is simply overwhelming. The codicil was written by an attorney entirely disinterested, and solely at the dictation of the testator, who subsequently read it over, and said he was satisfied, and then executed it in the presence of two subscribing witnesses, both of whom testified that he was perfectly sound and rational at the time. A number of other witnesses who had known him long and intimately, testified that he was a man of unusual force of mind, and entirely sound at all times. The testator went to Europe, after the codicil was executed, with his father, and was gone several months, attended to business when at home, and in all respects conducted himself as a rational man. He was given to the bad habit of excessive drinking at times, but knew his failing well, and voluntarily went to a home for inebriates a number of times in order to avoid indulgence. Those who knew him best, both at the home and in his business, and who were entirely impartial and disinterested, most emphatically pronounced him of perfectly sound mind at all times.

When it is considered that the only allegation against his mental soundness was his habit of excessive drinking; that this was not continuous, but periodical; that the fact of even ordinary intoxication at the time the codicil was executed is not proved, and that it is proved without contradiction that the codicil was dictated by himself and perfectly well understood by him both at the time of execution and after, it would be an act of judicial unwisdom to subject the parties to the cost and vexation of a trial that could have but one result, and that prejudicial to the appellant. We are most clearly of opinion that the issue was properly refused by the court below.

Decree affirmed and appeal dismissed at the cost of the appellant.